Michelle Chua (DC Bar 441990)
Bikram Bandy (DC Bar 480967)
Karen S. Hobbs (DC Bar 469817)
600 Pennsylvania Avenue, NW, CC-8528
Washington, DC 20580
202-326-3248 (Chua)
202-326-2978 (Bandy)
202-326-3587 (Hobbs)
mchua@ftc.gov; bbandy@ftc.gov
khobbs@ftc.gov
Attorneys for Plaintiff
Federal Trade Commission

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Federal Trade Commission, | Case No. |
| Plaintiff, | |
| v. | **COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |
| Electronic Payment Solutions of America, Inc., an Arizona corporation; | |
| Electronic Payment Services, Inc., an Arizona corporation; | |
| KMA Merchant Services, LLC, an Arizona limited liability company; | |
| Dynasty Merchants, LLC, an Arizona limited liability company; | |
| Jay Wigdore, individually and as an officer of Electronic Payment Services, Inc. and Electronic Payment Solutions of America, Inc.; | |
| Michael Abelmesseh a/k/a Michael Stewart, individually and as an officer of Electronic Payment Solutions of America, Inc., and KMA Merchant Services, LLC; | |
| Nikolas Mihilli, individually and as an officer of Dynasty Merchants, LLC; | |
| Electronic Payment Systems, LLC, a Colorado | |

1  limited liability company;

2  Electronic Payment Transfer, LLC, a Colorado limited liability company;

3  John Dorsey, individually and as an officer of
4  Electronic Payment Systems, LLC and Electronic Payment Transfer, LLC;

5  Thomas McCann, individually and as an
6  officer of Electronic Payment Systems, LLC and Electronic Payment Transfer, LLC; and

7  Michael Peterson, individually and as Risk Manager of Electronic Payment Systems, LLC,

8        Defendants.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1.     The FTC brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. §§ 6101-6108, to obtain permanent injunctive relief, rescission or reformation of contracts, restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of the FTC's Trade Regulation Rule entitled Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), and 6105(b).

3.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) and (c), and 15 U.S.C. § 53(b).

## SUMMARY OF CASE

4.     This is an action by the FTC for injunctive and equitable monetary relief on behalf of consumers against Defendants for their actions in laundering credit card transactions on behalf of a deceptive telemarketing scam called Money Now Funding ("MNF" or "MNF scam"). In 2013, the FTC sued MNF for telemarketing worthless business opportunities to consumers and falsely promising that consumers would earn thousands of dollars in income. In 2015, the court entered summary judgment and default

judgments against certain MNF defendants, finding the business opportunities were a complete fraud, as alleged in the complaint, and that consumers who purchased these opportunities lost thousands of dollars each, resulting in $7,375,258.84 in total consumer injury. Each of the remaining MNF defendants settled in 2015.

5. The principals of the MNF scam went to great lengths to hide their identities behind a large number of phony "businesses." In order to charge consumers' credit cards but make it difficult to trace the money back to MNF, MNF engaged in a credit card laundering scheme whereby its principals and employees created numerous fictitious companies, and then Defendants processed victim credit card charges through merchant accounts established in the names of these fictitious companies, rather than through a single merchant account in the name of MNF. MNF transactions were also laundered through at least two merchant accounts set up in the name of companies created by Defendant Abdelmesseh, and one merchant account set up in the name of a business created by Defendant Mihilli.

6. The practice of processing credit card transactions through another company's merchant accounts is called "credit card laundering" or "factoring" in the credit card industry. It is strictly forbidden by the credit card companies and is illegal under the TSR.

7. The banking system behind credit card processing involves a complex series of exchanges involving numerous entities. These entities include, on one side, the consumer and the consumer's bank and, on the other, the merchant and the merchant's

bank; between them are the credit card networks (*e.g.,* VISA) and other third parties such as "independent sales organizations" involved in processing a transaction.

8.     An independent sales organization ("ISO") solicits merchants seeking to open credit card merchant accounts and refers them to the ISO's acquiring bank ("acquirer"), which is the bank that has access to the credit card networks. In some cases, ISOs perform the underwriting of merchants for their acquirer and/or process consumer credit card payments on behalf of their acquirer, either directly or through the services of payment processors.

9.     Through the ISO's relationship with acquirers, ISOs function as important gatekeepers, screening out and preventing fraudulent merchants from gaining access to the credit card networks, or identifying such merchants once they have gained access. Conversely, an ISO that is complicit with a fraudulent merchant can provide such a merchant access to the credit card networks that the merchant would not otherwise be able to obtain or maintain.

10.     Defendant Electronic Payment Systems, LLC ("EPS") is an ISO that markets ISO and payment processing services to prospective merchants. In 2012 and 2013, EPS served as the ISO for the entities involved in the MNF scam.

11.     EPS engaged in the underwriting and approval of MNF's fictitious companies, and helped set up merchant accounts with its acquirer for these fictitious companies. Using the services of two payment processors, EPS processed more than $5,895,035 in MNF transactions through these and other fraudulent merchant accounts.

12.     EPS used ISO "sales agents" to market its processing services to merchants. Three of these sales agents, Defendants Jay Wigdore, Michael Abdelmesseh, and Nikolas Mihilli, directly participated in the MNF credit card laundering scheme.

13.     Defendant Wigdore submitted the merchant applications for the MNF fictitious companies to EPS. Once EPS processed MNF's transactions through the fictitious company accounts, the MNF sales revenues were transferred to companies controlled by Defendants Wigdore, Abdelmesseh, and Mihilli, as well as participants in the MNF laundering scheme.

**PLAINTIFF**

14.     The FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101–6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices.

15.     The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR, and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 6102(c) and 6105(b).

**DEFENDANTS**

16.     As explained below, this case involves two sets of defendants: the "KMA-Wigdore Defendants" and the "EPS Defendants" (collectively, "the Defendants"). The KMA-Wigdore Defendants are three individuals who acted as EPS's ISO sales agents, and four entities associated with these individuals. The EPS Defendants are the ISO—which uses the names Electronic Payment Systems, LLC and Electronic Payment Transfer, LLC—and their two principals and risk manager.

**The KMA-Wigdore Defendants**

17.     The KMA-Wigdore Defendants are three individuals who acted as EPS's ISO sales agents and who directly participated in the MNF credit card laundering scheme, and four corporate entities associated with these individuals. Two of these individuals, Defendants Jay Wigdore ("Wigdore") and Michael Abdelmesseh ("Abdelmesseh"), acted directly as EPS's ISO sales agents. The third individual, Defendant Nikolas Mihilli ("Mihilli"), acted as a sub-agent working under Wigdore and Abdelmesseh.

18.     Defendant Electronic Payment Services, Inc. ("EP Services") is an Arizona corporation with its principal place of business at 1640 W. Prescott Dr., Chandler, Arizona 85248. At all times material to this Complaint, EP Services acted as an ISO sales agent for Defendant EPS, and referred merchants to EPS for underwriting approval and payment processing services. EP Services used various dba names, including "EPS-America." EP Services transacts or has transacted business in this district and throughout the United States.

5

19.     Defendant Electronic Payment Solutions of America, Inc. ("EPSA") is an Arizona corporation with its principal place of business at 1048 N. 44th Street #100, Phoenix, Arizona 85008. At all times material to this Complaint, EPSA acted as an ISO sales agent for EPS, and referred merchants to EPS for underwriting approval and payment processing services. EPSA transacts or has transacted business in this district and throughout the United States.

20.     Defendant KMA Merchant Services, LLC ("KMA") is an Arizona limited liability company with its principal place of business at 714 N. 74th Street, Scottsdale, Arizona 85257. At all times material to this Complaint, KMA acted as an ISO sales agent for EPS, and referred merchants to EPS for underwriting approval and payment processing services. KMA also acted as a merchant and processed its own merchant transactions using EPS's ISO services. KMA transacts or has transacted business in this district and throughout the United States.

21.     Defendants EP Services, EPSA, and KMA used various dba names interchangeably, including EPS, EPSA, EPS-America, EPS of Arizona, EPS AZ, KMA, KMA Merchant Services, KMA Svcs, and Merchant Services. Emails sent by KMA indicate that KMA was the "customer service at EPS-america.net."

22.     Defendant Dynasty Merchants, LLC ("Dynasty") is an Arizona limited liability company with its principal place of business at 731 S. Arizona Ave., Chandler, Arizona 85225. At all times material to this Complaint, Dynasty acted as a merchant and processed its own merchant transactions using EPS's ISO services. Dynasty transacts or has transacted business in this district and throughout the United States.

23.     Defendant Wigdore is the President of EP Services and a director of EPSA. Individually and as an officer of EP Services and EPSA, Wigdore acted as an ISO sales agent for EPS. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of EP Services, EPSA, and KMA, including the acts and practices set forth in this Complaint. Wigdore transacts or has transacted business in this district and throughout the United States.

24.     Defendant Abdelmesseh, also known as Michael Stewart, is a director of EPSA and a managing member of KMA. Individually and as an officer of KMA and EPSA, Abdelmesseh acted as an ISO sales agent for EPS. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of EP Services, EPSA, and KMA, including the acts and practices set forth in this Complaint. Abdelmesseh transacts or has transacted business in this district and throughout the United States.

25.     Defendant Mihilli is an officer and member of Dynasty Merchants, LLC. Mihilli worked as a sub-agent for the ISO sales offices of Defendants Wigdore and Abdelmesseh. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of Dynasty Merchants, LLC, including the acts and practices set forth in this Complaint. Mihilli transacts or has transacted business in this district and throughout the United States.

**The EPS Defendants**

26.    Defendant Electronic Payment Systems, LLC ("EPS") is a Colorado limited liability company with its principal place of business at 6472 Quebec St., Englewood, Colorado 80111. EPS is an ISO and payment processor. Among other things, EPS markets payment processing services to merchants and arranges for merchants to obtain "merchant accounts" through which merchants can process credit card sales transactions. Using the services of payment processors, EPS processes credit card payments for merchants through EPS's acquirer. EPS transacts or has transacted business in this district and throughout the United States.

27.    Defendant Electronic Payment Transfer, LLC ("EPT") is a Colorado limited liability company with its principal place of business at 6472 Quebec St., Englewood, Colorado 80111. EPT is closely affiliated with EPS, and uses the dba "Electronic Payment Systems." EPT transacts or has transacted business in this district and throughout the United States.

28.    Defendants EPS and EPT are controlled and owned by the same two principals, and are often referred to interchangeably as the same company. EPS is the outward-facing company to the public, while EPT is the entity that sometimes enters into the agreements that EPS holds with its acquirer and payment processors. This Complaint will refer to EPS and EPT collectively as "EPS."

29.    Defendant John Dorsey ("Dorsey") is the CEO and co-owner of EPS and EPT. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of EPS and

8

EPT, including the acts and practices set forth in this Complaint. Defendant Dorsey transacts or has transacted business in this district and throughout the United States.

30.    Defendant Thomas McCann ("McCann") is the Managing Member and co-owner of EPS and EPT. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of EPS and EPT, including the acts and practices set forth in this Complaint. Defendant McCann transacts or has transacted business in this district and throughout the United States.

31.    Defendant Michael Peterson ("Peterson") is the Risk Manager of EPS. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, or participated in the acts and practices of EPS, including the acts and practices set forth in this Complaint. Defendant Peterson transacts or has transacted business in this district and throughout the United States.

## COMMERCE

32.    At all times material to this Complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## THE DECEPTIVE MONEY NOW FUNDING SCAM

33.    From 2011 to 2013, the principals of MNF operated a deceptive telemarketing scam, charging thousands of consumers more than $7 million for worthless business opportunities and related upsells. In one principal variation of the scam, MNF

telemarketers falsely told consumers they would earn income by referring small businesses seeking loans to MNF.

34.    According to one sales pitch, in exchange for an upfront payment of $299 to $499, purchasers of MNF's business opportunity would go into business with MNF and receive lucrative commissions each time MNF made a loan to a small business referred by the consumer.

35.    After consumers made the upfront payment, MNF telemarketers then further engaged in deceptive "upsells," and convinced consumers to pay thousands of dollars more for so-called "leads," *i.e.*, names and contact information for businesses in need of loans. MNF telemarketers falsely promised consumers that these leads would easily generate hundreds or thousands of dollars per month in income, and would result in huge returns on the consumers' investment in the business opportunity.

36.    In granting the FTC's motion for summary judgment, the court found that MNF was a multi-million dollar scheme to defraud consumers. The entire MNF sales pitch was a brazen scam. MNF was a total fraud, and not actually in the business of making loans to small businesses. Consumers never earned any of the promised income from the MNF business opportunities, and typically lost their investment, with losses ranging from a few hundred dollars to tens of thousands of dollars per consumer.

37.    The MNF scam operated through a web of interrelated companies, including "Rose Marketing." When consumer complaints about MNF's scam mounted, threatening exposure of the scam, the principals and employees behind MNF changed the

scheme's name and created new companies to continue operating the scam, under different and constantly changing names.

38.     The FTC filed an action against MNF and its related and successor companies on August 5, 2013, alleging that the deceptive and fraudulent business opportunity scam violated the FTC Act, the Business Opportunity Rule, and the Telemarketing Sales Rule. FTC v. Money Now Funding, LLC, et al., CV 13-01583-PHX-ROS (D. Ariz. 2013). The complaint, which was amended on December 16, 2013, alleged, among other things, that MNF created fictitious companies supposedly owned by various MNF employees and applied for merchant accounts under these fictitious companies, and that MNF then used such merchant accounts to launder its credit card transactions.

39.     In 2015, the FTC settled with many of the defendants named in the MNF scam, obtaining court orders banning eighteen individual defendants from selling business or work-at-home opportunities. Also in 2015, the court granted the FTC's motion for summary judgment against certain MNF defendants, and entered default judgments against the remaining MNF defendants, resulting in the entry of permanent injunctions and monetary judgments. In 2016, the Arizona Attorney General's office brought criminal charges against four individuals involved in the MNF scam. As of January 25, 2017, all four had entered guilty pleas, with the lead defendant agreeing to a five-year prison term.

## BACKGROUND ON CREDIT CARD LAUNDERING

40.     In order to accept credit card payments from consumers, a merchant must establish a "merchant account" with a merchant acquiring bank (as noted above, also referred to as an "acquirer"). A merchant account is a type of account that allows businesses to process consumer purchases by a credit or debit card.

41.     The acquirer is the entity that has access to the credit card associations (such as Mastercard and VISA), and through which merchant accounts are established. Without a merchant account obtained through an acquirer, merchants are unable to process consumer credit or debit card sales transactions.

42.     Acquirers commonly enter into contracts with ISOs, who solicit and sign up merchants for merchant accounts with the acquirer. In some cases, ISOs engage in the screening and underwriting of prospective merchants, operate the acquirer's merchant processing program (directly or through the services of third party processors), and monitor the merchants' transactions.

43.     To market the ISO's processing services, ISOs often use ISO "sales agents," and persons working under these sales agents (called "sub-ISOs" or "sub-agents"), who solicit and refer prospective clients to the ISO for the ISO's underwriting approval.

44.     The credit card associations ("card networks"), such as VISA and Mastercard, require all participants in their networks, including the acquirers and their registered ISOs, to comply with detailed rules governing the use of the card networks. These rules include screening and underwriting merchants to ensure that they are

legitimate bona fide businesses, and to screen out merchants engaged in potentially fraudulent or illegal practices. The rules also prohibit the practice of credit card laundering.

45.     Merchants that pose a greater risk of fraud or financial loss to the ISO, acquirer and card networks may be denied merchant accounts. For example, the ISO or acquirer may be concerned that the merchant is engaged in deceptive marketing, illegal activity or will generate excessive rates of transactions returned by consumers ("chargebacks").

46.     Consumers initiate "chargebacks" when they dispute credit card charges by contacting their "issuing bank," which is the bank that issued the credit card to the consumer. When a consumer successfully disputes the charge, the consumer's issuing bank credits the consumer's credit card for the disputed amount, and then recovers the chargeback amount from the acquirer (the merchant's bank). The acquirer, in turn, collects the chargeback amount from the merchant, either directly or through its ISO or payment processor.

47.     In order to detect and prevent illegal, fraudulent or unauthorized merchant activity, the card networks operate various chargeback monitoring and fraud monitoring programs. For example, if a merchant generates excessive levels of chargebacks that trigger the thresholds set under VISA's chargeback monitoring program, the merchant is subject to additional monitoring requirements and, in some cases, penalties and termination.

48.     In recent years, credit card laundering has become a common practice of fraudulent merchants who cannot meet a bank's underwriting criteria or who cannot obtain merchant accounts under their own names (whether because of excessive chargebacks, complaints, or other signs of illegal activity).

49.     Even when the fraudulent merchant can qualify for a merchant account, it often engages in laundering as a way to conceal its true identity from consumers, the acquirer, the card networks, and law enforcement agencies.

50.     To conceal their identities, fraudulent merchants often create shell companies to act as fronts, and apply for merchant accounts under these shell companies. Once the merchant accounts are approved, the fraudulent merchant then launders its own transactions through the shell company's merchant accounts.

51.     Fraudulent merchants often generate excessive rates of "chargebacks" from consumers who dispute the credit card charges. To avoid triggering the card networks' chargeback monitoring programs and attracting the scrutiny of the acquirer, fraudulent merchants often spread out their sales transaction volume across multiple merchant accounts—a practice commonly referred to as "load balancing."

52.     Because the VISA and Mastercard chargeback monitoring programs apply only to merchants with at least 100 chargeback transactions per month, fraudulent merchants can manipulate the system and avoid chargeback monitoring by spreading their transactions across multiple merchant accounts and ensuring that no single account has more than 100 chargebacks per month. They can also avoid triggering the monitoring

14

programs by simply processing for short time periods, such as for a few weeks, that fall below the monitoring programs' time thresholds.

53.     In addition to evading the card networks' merchant monitoring programs, fraudulent merchants sometimes spread their transactions across multiple merchant accounts in order to circumvent the underwriting requirements or monitoring programs of the ISO's acquirer. For example, if the acquirer's underwriting rules are more lenient for merchants with lower projected sales volume, fraudulent merchants can artificially lower the merchant's projected sales volume by applying for numerous low-volume merchant accounts in the names of fictitious companies, thereby obtaining the acquirer's underwriting approval that the merchant otherwise would not be able to obtain.

54.     By spreading out merchant transactions across numerous and constantly changing fraudulent merchant accounts over short time periods, fraudulent merchants and unscrupulous ISOs can cause an enormous amount of economic harm to consumers, before their transactions are detected or terminated by the ISO's acquirer or the card networks.

## DEFENDANTS' BUSINESS ACTIVITIES

### The KMA-Wigdore Defendants Engaged In a Scheme
### To Launder Credit Card Payments For the MNF Scam

*The KMA-Wigdore Defendants' Acts Directly Caused The Laundering Of*
*MNF Transactions Through Numerous Fictitious Companies' Merchant Accounts*

55.     The MNF scam, in which consumer-victims were persuaded to make purchases over the telephone, relied on MNF having the ability to accept victim funds via credit and debit cards without raising fraud alerts. To conceal its identity and to prevent

the acquirer and card networks from scrutinizing and terminating its merchant account,

MNF engaged in a scheme with the KMA-Wigdore Defendants to apply for a large

number of fraudulent merchant accounts, each under a different fictitious name, through

which MNF could launder charges to consumers' credit or debit card accounts.

56.     As part of this scheme, MNF created numerous fictitious companies, each

using the name of a MNF principal or employee as the straw owner or purported

principal of the company. These phony companies did not engage in any actual business.

Thus, for example, one fictitious company was called "D&D Marketing," the supposed

owner of which was actually an MNF employee with the initials "D.D." When consumer-

victims signed up for the MNF business opportunity and made a payment, their credit

card statements would show a charge made by a company they had never heard of, such

as "D&D Marketing," rather than Money Now Funding.

57.     During the period from May 2012 to November 2012, Defendant Wigdore,

as an ISO sales agent, submitted phony merchant applications on behalf of 23 fictitious

companies to EPS for EPS's underwriting approval. These 23 fictitious companies

created by the MNF scam include: Zoom Docs; Doc Assistant; US Legal Docs; D&D

Marketing; JJB Marketing; A&D Marketing; Miller Marketing; Ronn Hobbs &

Associates; Global One Media; DePaola Marketing; Wisdom Management Group;

National Marketing Group; Rose Marketing; Green Merchant Marketing; KT

Advertising; V&R Marketing; BC Media Solutions; Elite Marketing Strategies; AJ

Marketing; Midwarren Enterprises; Montgomery Marketing; McIntyre Marketing; and

LJT Marketing ("2012 MNF Fictitious Companies").

58.     When submitting the 23 phony applications, Wigdore used his own individual name as the sales agent, but did not list himself as acting under Electronic Payment Services, Inc. (the company Wigdore controlled that was also acting as an ISO sales agent for EPS). Instead he listed himself as acting under KMA Merchant Services (the company ostensibly controlled by Defendant Abdelmesseh that had a contractual agreement with EPS to act as EPS's sales agent).

59.     When applying for a merchant account, merchants often submit with the application a copy of a voided check drawn on their business bank account, with the understanding that credit card sales revenues will be transferred into this account.

60.     For each of the 23 fraudulent merchant applications, Wigdore attached a falsified voided (or preprinted) check that purported to reflect the existence of a business bank account in the name of that fictitious company. Each check had been doctored to reflect an account holder, *i.e.*, the fictitious company, that was not the true account holder for that account number. The account number printed on the bottom of each check corresponded with one of 23 different bank accounts at J.P. Morgan Chase Bank ("Chase"), each in the name of Defendant Dynasty Merchants, LLC, a company controlled by Defendant Mihilli.

61.     The 23 bank accounts at Chase ("Dynasty Chase Accounts") were set up by Wigdore's associate, Defendant Mihilli, who worked as a sub-agent under the KMA sales office of Defendants Wigdore and Abdelmesseh.

62.     After receiving the fraudulent applications from Wigdore, EPS approved all 23 applications, set up merchant accounts for each fictitious company, and immediately began processing for these accounts through EPS's acquirer, Merrick Bank ("Merrick").

63.     When MNF transactions were processed through the 23 fraudulent merchant accounts in the names of the fictitious companies, the sales revenues from these transactions were automatically transferred into the 23 Dynasty Chase Accounts, and subsequently transferred into a "Master Account" at the same bank, also held in the name of Dynasty.

64.     From the Dynasty "Master Account," funds were divided up and eventually paid to Defendant EP Services (a company controlled by Wigdore, and an alias of KMA), companies affiliated with the MNF scam (*e.g.*, Rose Marketing), and individually to Defendants Abdelmesseh and Mihilli.

65.     The scheme allowed MNF to obtain merchant accounts based on false information in the merchant applications. Specifically, each merchant application contained the following false information: (1) the name of the fictitious company was listed as the applicant, when the true applicant was the principal(s) of the MNF scam; (2) the name of the straw owner was listed as the owner of the business, when the true owner was the owner(s) of the MNF scam; and (3) the fictitious company was listed as the account holder of the merchant bank account, when the true account holder was Dynasty Merchants, LLC.

66.     The structure of the laundering scheme—in which revenues from the MNF sales transactions were processed through fraudulent merchant accounts in the names of

the 23 fictitious companies and were ultimately funneled to both the MNF scam's

principals and to bank accounts controlled by Defendants Wigdore, Abdelmesseh and

Mihilli—establishes one aspect of the central role played by the KMA-Wigdore

Defendants in the scheme. The KMA-Wigdore Defendants' acts in submitting fraudulent

applications for the 2012 MNF Fictitious Companies directly caused the laundering of

MNF transactions through these fictitious companies' merchant accounts.

67.     In 2013, the principals, employees and associates of MNF changed the

MNF fraudulent scheme's name, and continued operating the same scam through newly

created companies and aliases (i.e. "Affinity Technologies, "Green Merchant Funding,"

"Nationwide Lending"), and using numerous new fictitious company names ("2013 MNF

Fictitious Companies"). The KMA-Wigdore Defendants submitted to EPS phony

applications for these 2013 MNF Fictitious Companies. In turn, EPS approved the phony

applications, opened merchant accounts for the 2013 MNF Fictitious Companies at

Merrick, and continued processing transactions for the MNF scam through these

fraudulent merchant accounts.

68.     In addition to laundering MNF transactions through the 2012 MNF

Fictitious Companies and the 2013 MNF Fictitious Companies (collectively, "MNF

Fictitious Companies"), Defendants Abdelmesseh and Mihilli also participated directly in

the MNF scam by laundering MNF transactions through their own merchant accounts.

*Defendants Abdelmesseh And KMA Laundered MNF
Transactions Through KMA's Own Merchant Accounts*

69.     In addition to acting as EPS's ISO sales agent under KMA, Defendant Abdelmesseh also purported to operate his own independent businesses (called KMA Leads, KMA Merchant Marketing, and KMA Merchant Services) that supposedly offered "advertising/marketing services" and "merchant services" to consumers.

70.     EPS approved and helped open merchant accounts at Merrick for these three supposed KMA businesses. Between October 2010 and May 2012, EPS processed more than $1,384,500 in transactions for the three KMA merchant accounts combined.

71.     At least two of KMA's merchant accounts were used to launder MNF sales transactions. In other words, when MNF victims were duped into buying leads or making other payments as part of the MNF scam, some of them incurred credit card charges in the name of one of the "KMA" businesses.

*Defendant Mihilli Laundered MNF Transactions
Through Mihilli's Own Dynasty Merchant Account*

72.     In addition to working as a sub-agent under the ISO sales office of Defendants Wigdore and Abdelmesseh, Defendant Mihilli also purported to operate his own independent business, Dynasty Merchants, LLC (sometimes using the dba "Dynasty Marketing"), that supposedly offered "marketing services" to consumers.

73.     EPS approved and helped open a merchant account in the name of "Dynasty Marketing" at Merrick. Between May 2012 and September 2012, EPS processed more than $228,162 in transactions through this merchant account. In some cases, MNF transactions were processed through this merchant account. This meant that

when MNF victims were duped into buying leads or making other payments as part of the MNF scam, some of them incurred credit card charges in the name of "Dynasty Marketing."

**EPS Directly Caused the Laundering of MNF Transactions Through Numerous Merchant Accounts Created In The Names of Other Companies**

74.     Throughout 2012 and 2013, EPS directly caused consumers' credit or debit card accounts to be charged by MNF's deceptive telemarketing scam by underwriting and approving the MNF Fictitious Companies and the Mihilli and Abdelmesseh businesses for processing, establishing merchant accounts for these entities with Merrick, and processing for these merchant accounts.

75.     Without the ISO and processing services provided by EPS, the MNF scam could not have obtained the fraudulent merchant accounts established at Merrick, through which their credit card transactions were processed.

***EPS Touted Itself as a Processor for "High Risk" Merchants and Used Wigdore as a Sales Agent Despite His Criminal History***

76.     In order to solicit and locate prospective merchants, EPS operated an ISO sales program under which it used ISO "sales agents" to market EPS's services and to refer merchant applications to EPS for underwriting approval. EPS actively sought to recruit sales agents, and entered into independent contractor agreements ("Marketing Agreements") with these agents.

77.     According to statements made by EPS in court filings in July 2016 (*see* Mot. To Quash (ECF No. 9), <u>Electronic Payment Transfer, LLC v. Federal Trade Commission and Citywide Banks</u>, No. CV-01653-RBJ (D. Colo. July 11, 2016)), EPS's

relationship with Wigdore dated back to approximately 2004. This relationship continued

while Wigdore served a 57-month sentence on a federal fraud conviction from 2006 to

2009; during this period Wigdore's wife, Sandy Wigdore, continued acting as an ISO

sales agent for EPS.

78.     EPS's principal, Defendant Thomas McCann, was fully aware of

Wigdore's criminal history, but chose to continue using Wigdore as EPS's sales agent.

On August 6, 2008, Sandy Wigdore handwrote the following comments on a fax cover

sheet that accompanied a Marketing Agreement faxed to EPS:

> P.S. Let me know what Tom [Defendant Thomas McCann] thinks – they
> (Probation dept.) start coming around in a month or so to ask me questions
> about Jay working and maybe call you guys to confirm. – Thank you so
> much.

79.     Defendant Thomas McCann had a longstanding personal relationship with

Wigdore, as reflected in various email messages from 2010 and 2011, such as the

message "Please call Jay Wigdore on his cell. He says he has some gossip for you" or

"Jay Wigdore called while you were at lunch. He said that if you were coming to town he

would like to take you to dinner and introduce you to Les."

80.     McCann's and Dorsey's interest in using Wigdore as EPS's sales agent was

not surprising. EPS has held itself out as a processor for "High Risk" businesses that have

difficulty finding banks willing to accept their business. As recently as November 2015,

EPS's website touted the fact that it had a "98% Approval Rate" for merchants who

applied for its credit card processing services, as compared to its competitors who had a

"60% Approval Rate."

81.     EPS's website actively sought out the business of "High Risk Merchants," and offered to help merchants set up "offshore merchant accounts." The website stated:

> Is your business having trouble getting approved for traditional merchant service accounts? Do you need a High Risk Merchant Account? . . . We can get your High Risk merchant account approved in a quick and professional manner. When US domestic banks won't accept a High Risk Merchant, EPS has special partnerships with international banks overseas to set up an offshore merchant account with.

82.     As an ISO for Merrick, EPS was contractually required to comply with Merrick's underwriting rules for screening merchants, which included strict guidelines designed to verify the identity of the merchant and the legitimacy of the merchant's business, and to screen out merchants potentially engaged in fraud. Indeed, Merrick's policy required EPS to verify "that each merchant is a bona fide business and that the transactions of such merchant will reflect bona fide business between the merchant and the cardholder, and will not violate any applicable provision of law." EPS was also required to monitor its merchants' transactions, update merchant information in the merchant database, and ensure that its merchants complied with the card networks' rules and various fraud monitoring programs. As a registered ISO with VISA (through Merrick), EPS also was required to comply with VISA's rules and regulations.

83.     However, rather than verify its merchants' identities, EPS opened merchant accounts in the names of numerous fictitious companies for the same underlying merchant, and thereby falsely represented the true identity of the fictitious companies. In concealing the true identity of the fictitious companies, EPS also evaded the various card network fraud and chargeback monitoring programs that were designed to detect and prevent fraudulent activity.

84.     The chronology of EPS's involvement in the MNF scam's credit card laundering shows that EPS: (a) ignored obvious warning signs of fraud, including the likely presence of credit card laundering, (b) concealed from Merrick (the acquirer) and the card networks the true identity and nature of the MNF Fictitious Companies, and (c) made every effort to continue processing for the MNF Fictitious Companies, and other merchants related to the KMA-Wigdore Defendants, even after Merrick noticed signs of fraud and instructed EPS to stop.

### December 2011: Merrick Rejects KMA Merchant Account

85.     EPS processed merchant transactions through three merchant accounts it had opened for Defendant KMA. As early as December 2011, Merrick declined a merchant application that EPS submitted for one of KMA's merchant accounts, under the name "KMA Leads."

### March 2012 - May 2012: Merrick Notified EPS That a KMA Merchant Account Had an Unacceptably High Chargeback Ratio, and Appeared To Be "Load Balancing"

86.     Even though Merrick had declined one KMA merchant account ("KMA Leads"), EPS continued processing for another KMA merchant account—"KMA Merchant Services." That account presented a range of problems from March 2012 through May 2012, detailed below, leading Merrick to request EPS to terminate the account.

   a) On March 20, 2012, Merrick's Risk Management department emailed Defendant Peterson, alerting him that the KMA Merchant Services

24

merchant account had triggered Mastercard's fraud monitoring program, and requesting additional merchant information.

b) On April 10, 2012, Merrick again emailed Peterson, notifying him that Mastercard was requesting additional information about KMA, including details "as to what fraud control measures in place at the merchant location…."

c) On April 17, 2012, Merrick's Risk Manager emailed Peterson regarding the KMA merchant account, this time alerting him to five consumer chargeback requests that indicated "Services not provided or merchandise not received" as the reason for the chargeback, and an additional chargeback complaint regarding a related KMA account that indicated "Fraudulent transaction no cardholder authorization."

d) On April 18, 2012, Merrick's Risk Manager emailed Peterson regarding KMA's 15.6% chargeback rate, stating: "This account is processing well over the assigned volumes and their chargeback ratio is unacceptable …."

e) On May 11, 2012, Merrick's Risk Manager again emailed Peterson regarding KMA:

> I have reviewed in detail your chargeback reduction plan for KMA. The business was incorporated in 2011 and I am inclined to not believe that they are unfamiliar with how to run their business. It is ironic that as soon as they came onboard with EPS their volume skyrocketed and they blew through the volume caps UW [underwriting] had in place . . . Another concern is the amount of chargebacks and the reason codes for them (services not provided) … The merchant's business model as

described in the plan is unclear and sounds a lot like
they are conducting lead generation, which Merrick was
not comfortable with processing for in the first place ….

f)   Merrick's email went on to express the opinion that KMA was engaging in

load balancing, and instructed EPS to terminate the KMA accounts if KMA

could not succeed in lowering its chargeback levels to an acceptable level:

The other KMA account MID # xx 5830 also has been
processing well over their capped volumes . . . and has
unacceptable chargeback ratios**.** I personally believe that
they are load-balancing and processing for both the
account that was declined and the one we are
discussing…. [Emphasis added]

87.   As discussed in Paragraphs 51-53 above, "load balancing" refers to the

practice of spreading out a merchant's transactions across numerous merchant accounts

in order to limit the volume of transactions processed through any one single merchant

account, and thereby to avoid triggering the chargeback thresholds for the acquirer's or

card networks' chargeback monitoring programs.

88.   As a result of Merrick's instructions to terminate KMA's merchant

accounts, EPS stopped processing new transactions for KMA's merchant accounts

around May 2012. However, EPS continued to approve merchant account applications

submitted by KMA (acting in its capacity as EPS's sales agent).

### *May 2012 - June 2012: Merrick Rejected Merchant Applications*
### *Submitted By EPS Because They Appeared to Be KMA-Related*

89.   Even after Merrick instructed EPS to terminate the KMA merchant

accounts of KMA due to concerns regarding load balancing, fraud, and excessive

chargebacks, EPS and its principals nonetheless continued approving new merchant

applications submitted to it by the same entity, KMA (this time acting in its capacity as EPS's sales agent, rather than as a client merchant itself). EPS chose not to inform Merrick that KMA was the sales agent for these new merchant applications. However, when Merrick would discover a KMA connection, Merrick would decline the application.

90.     On May 24, 2012, Merrick informed Defendant Peterson that it had declined three merchant applications because the alleged principals of these merchants all shared the same email address as the principal of the merchant KMA. Merrick noted that the three declined merchants "have principal email addresses with the alias being at kmamarketingsvcs.com – KMA had chargeback issues with us in the past."

91.     One week later, on May 31, 2012, Merrick declined yet another application, again informing Peterson that the merchant "also appears to be linked to KMA Marketing which has had chargeback issues with us."

92.     Two weeks later, on June 14, 2012, Merrick declined four more merchant applications, this time highlighting the fact that all four applications had been referred to EPS by the same sales agent ("sales channel 2088," a sales office number that EPS had assigned to KMA, acting as its sales agent), and that the merchants were all "home-based marketing companies," a business model that Merrick had indicated it was not comfortable with.

93.     Despite these rejections and Merrick's repeatedly-stated desire not to do business with companies linked to the merchant KMA, Peterson continued to submit new merchant applications to Merrick that had been referred by EPS's "sales agent" KMA,

without informing Merrick that KMA was the underlying sales agent who had referred

those applications to EPS.

*May 2012 - November 2012: EPS Approved The 23 Fraudulent*
*MNF Merchant Applications Provided By Sales Agent KMA*
*Despite Multiple Suspicious Red Flags*

94.     From May to November 2012, Defendant Wigdore submitted 23 merchant

applications on behalf of the 2012 MNF Fictitious Companies to EPS. Each application

indicated that the sales agent was "Jay Wigdore" of ISO sales office "2088." As noted

above, this was the number EPS had assigned to its sales agent KMA, although on their

face the applications did not mention KMA directly. In addition to the fact that the

applications were referred by the sales agent KMA, an entity whose own business (as an

EPS client merchant) Merrick had repeatedly rejected due to concerns about fraud, these

applications from 23 supposedly different merchants appeared virtually identical and

contained numerous suspicious red flags, as described below. EPS approved them all.

a)  Almost all the merchants were located in the Phoenix, Arizona area. The

"business description" provided for most of the merchants was extremely

vague, almost always identical (*i.e.* "marketing and advertising"), and

provided no specific description of the product or service being sold.

b)  The 23 supposedly separate merchants attached facially suspect checks that

appeared almost identical in form. Each of the attached doctored checks

was drawn on Chase bank and had the same bank routing number,

indicating the same bank branch. Almost all of them bore the same check

number—"1001." The fact that 23 supposedly different merchants all

purported to hold accounts at the same bank branch and submitted virtually identical checks (almost always bearing the same check number) was a glaring indicator that they were likely related to each other or to the same underlying merchant. Despite these red flags, EPS did not even bother to verify the legitimacy of the 23 bank accounts at Chase.

c) During the initial underwriting stage, EPS obtained credit reports for each of the 23 fictitious companies. For most of the merchants, the credit reports indicated that the principals or owners of the businesses had low credit scores, poor credit ratings, and owed substantial outstanding debts, raising obvious questions about the financial health of the merchants and the nature of their businesses. EPS nonetheless approved the 2012 MNF Fictitious Companies, without seeking to obtain additional information about the businesses or their financial viability.

d) Although Merrick's underwriting policy required EPS to obtain and evaluate samples of all relevant merchant marketing materials and telemarketing scripts, the 23 merchant applications failed to include copies of the merchants' marketing materials.

e) Merrick's policy further required EPS to obtain screen prints of the relevant web pages of the merchant's website for "high risk" merchants such as telemarketers; however, for at least six merchant applications, the "Initial Risk Evaluation" conducted by EPS's employee specifically noted that the merchant did not have a valid merchant website.

  f) In the case of at least five merchant applications, the address listed on the credit report did not match the address listed for the merchant on the merchant application.

  g) For at least five of the merchant applications, an attached Application Addendum form stated that "Jay Wigdore" was a co-owner or co-officer of the alleged merchant, in addition to another co-owner or co-officer whose name was listed on the application form.

  h) In the case of five merchants, the merchant's business bank account was listed on the application as "Comerica Bank," even though the checks attached to the applications indicated that the merchant's bank was Chase Bank, and not Comerica Bank. Despite this obvious inconsistency, EPS nonetheless approved these applications.

95. Had EPS sought to verify the legitimacy of the 23 merchant bank accounts, it would have discovered that the true account holder for each of the 23 Chase bank accounts was not the fictitious company whose name was printed on the check and listed on the merchant application, but a different company: Dynasty Merchants, LLC.

***The EPS Defendants Concealed the Fact That the Fictitious Companies Were High-Risk Telemarketers, Thereby Shielding Them From Enhanced Scrutiny By Merrick or VISA***

96. Many of the merchant applications for the MNF Fictitious Companies submitted by Wigdore contained clear indications that the merchants were engaged in telemarketing. For example, a section on the application form entitled "Merchant Product/Service Profile" asked "How is the Product or Service Ordered or Purchased

(mail order, catalog, over the phone, in person, etc.)." The merchant applications contained the handwritten response "over the phone," indicating telemarketing.

97.     Because telemarketers pose a higher risk of fraud, VISA rules require telemarketers to be classified and coded as "High Brand Risk Merchants." VISA rules further require that the correct "Merchant Classification Code" (or "MCC") be assigned to all merchants. The MCC numbers 5966 and 5967 are used to indicate inbound and outbound telemarketers, which are "High Brand Risk Merchants."

98.     VISA imposes heightened monitoring requirements for all merchants that are coded as "High Brand Risk Merchants," including merchants engaged in telemarketing. These monitoring requirements are designed to detect and prevent merchants from processing fraudulent or illegal credit card transactions through VISA's network.

99.     Even though the merchant applications for many of the MNF Fictitious Companies indicated that these entities were engaged in telemarketing, EPS concealed this fact by failing to assign to these entities the correct MCC number required for telemarketers. Instead, EPS entered MCC number 7311, which simply refers to "advertising services."

100.     By not coding the MNF Fictitious Companies as telemarketers and concealing this fact, EPS was able to avoid placing these merchants under the heightened monitoring program required by VISA for "High Brand Risk Merchants."

101.     Also, Merrick's underwriting policy and rules prohibited EPS from processing for telemarketers (and other categories of merchants deemed by EPS to be

31

"high risk"), prior to obtaining Merrick's approval. Even though the applications indicated that many of the MNF Fictitious Companies were engaged in telemarketing, EPS began processing for these entities prior to obtaining Merrick's approval, in direct violation of Merrick's rules.

### May 2012 - July 2012: EPS Processed For At Least 11 Fictitious Companies Declined By Merrick, In Some Cases For More Than Two Months After They Had Been Declined

102.    Not only did EPS begin processing for MNF's fictitious companies before these companies were approved by Merrick, EPS also *began processing* for certain MNF fictitious companies *even after* Merrick already had declined the applications for these same fictitious companies.

103.    Between May 2012 and June 2012, Merrick declined 11 fraudulent merchant applications approved and submitted by EPS on behalf of the 2012 MNF Fictitious Companies. EPS nonetheless continued processing for these fictitious companies, in some cases for more than two months after they had been declined by Merrick.

104.    By the end of June 2012, EPS had processed more than $573,000 in transactions for the 11 declined fictitious companies, for time periods ranging from just two weeks to eight weeks per merchant—short time periods that fall below VISA's chargeback monitoring program thresholds.

105.    Below is a list of the 11 fictitious companies declined by Merrick, the time periods EPS processed for each company, and the amount of transactions processed through each merchant account:

| MNF Fictitious Company | Time Period Processed | Amount Processed |
|---|---|---|
| JJB Marketing | 4 weeks | $ 29,600 |
| Miller Marketing | 7 weeks | $ 67,400 |
| Ron Hobbs | 5 weeks | $ 32,100 |
| National Marketing GP | 4 weeks | $ 52,500 |
| Rose Marketing | 5 weeks | $ 50,247 |
| Wisdom Management | 6 weeks | $ 64,000 |
| D&D Marketing | 6 weeks | $ 80,400 |
| DePaola Marketing | 2 weeks | $  9,500 |
| KT Advertising | 8 weeks | $115,050 |
| V&R Marketing | 7 weeks | $145,100 |
| Green Merchant | 2 weeks | $  55,598 |

***July 2012 - September 2012: After Merrick Declined 11 Merchant Applications Submitted To EPS By Sales Agent Wigdore, EPS Approved and Forwarded to Merrick Seven New Fraudulent Applications Referred By the Same Sales Agent***

106.   By the end of June 2012, Merrick had declined 11 applications referred to EPS by Wigdore. Between July 24, 2012 and September 5, 2012, EPS nonetheless approved and forwarded to Merrick seven additional fraudulent merchant applications (for seven of the 2012 MNF Fictitious Companies), each of which had been referred by Wigdore.

107.   These seven new applications appeared suspiciously similar to the 11 applications previously declined by Merrick. They attached the same facially suspect checks indicating that the merchants all banked at the same bank ("Chase") and had the same routing number. Four applications indicated that the merchant's bank was Comerica, even though they attached a "Chase" bank check. The credit report for one merchant (LJT Marketing) indicated an extremely poor credit score and a "past due amount" of $144,904 owed by the merchant, while the credit report for another merchant (Midwarren Enterprises) showed a "past due amount" of $24,344. The address listed on

the credit report for a third merchant (McIntyre Marketing) did not match the merchant address listed on the application. For four of the merchants, the initial risk review conducted by an EPS employee specifically noted that no marketing materials or web listings for the merchant had been submitted or found. (BC Media Solutions, Montgomery Marketing, McIntyre Marketing, LJT Marketing). Despite these obvious red flags, EPS nonetheless approved all seven applications.

108.    As in the past, EPS processed for these seven new accounts for short time periods, typically ranging from three to seven weeks.

### Consumer Chargebacks Indicated That Some of the Fictitious Company Merchant Accounts Approved By EPS Were Used To Launder MNF Transactions

109.    Merrick's underwriting policy required EPS to monitor its client merchants' transactions "in order to detect unusual or unacceptable trends in such Merchant's processing activity," and to monitor its merchants' chargeback transactions and consumer inquiries relating to these chargeback transactions.

110.    EPS regularly monitored its merchants' chargeback transactions. Through the processing platforms provided by two payment processors, EPS had access to its merchants' chargeback transaction data, together with the consumer complaints that accompanied chargeback requests.

111.    Once EPS began processing for the 23 accounts set up for the 2012 MNF Fictitious Companies, these accounts began generating substantial chargebacks, many of which included "chargeback reason codes" indicating that the merchant's charges either

were not authorized by the consumer, were fraudulent, or that the merchant failed to provide the goods or services as promised.

112.    In some cases, the chargeback requests included consumer complaints and documentation clearly indicating that the merchant involved was "Money Now Funding," and not the fictitious company whose name was on the merchant account—obvious evidence of credit card laundering.

113.    Despite having clear evidence of illegal credit card laundering through a KMA merchant account, EPS not only failed to stop doing business with KMA, but actively sought to protect KMA's ability to continue laundering, as set forth below.

***September 2012: EPS's Risk Manager Knew That MNF Transactions Were Laundered Through a KMA Merchant Account, and Directly Instructed KMA to Spread Out Its Merchant's Transactions Across Numerous Merchant Accounts***

114.    As EPS's Risk Manager, Defendant Peterson oversaw EPS's Risk Department, and closely interacted with EPS' principals, Defendants Dorsey and McCann, and EPS's Chief Operating Officer ("COO").

115.    Peterson directly communicated with Defendants KMA and Abdelmesseh on a regular basis, and knew that KMA was acting as both EPS's sales agent and a "client merchant" for whom EPS processed transactions. Peterson knew that MNF transactions were being laundered through at least one of KMA's three merchant accounts, in the name KMA Merchant Services.

116.    On September 4, 2012, Peterson received an email from an EPS employee working directly under Peterson's supervision. The email forwarded to Peterson a consumer's chargeback dispute documentation for a "KMA Merchant Services"

merchant account and stated: "all supporting documentation sent in to rebuttal dispute has 'Rose Marketing, LLC' plastered all over the paperwork."

117.   As discussed previously, Rose Marketing was one of the companies that sold MNF's bogus business opportunity. The chargeback documents clearly indicated that the transactions for a company called "Rose Marketing" had been laundered through the KMA merchant account.

118.   Peterson immediately forwarded the email to "Mike Stewart" of KMA (Defendant Abdelmesseh), adding:

> Stewart, We cannot win pre-arb [prearbitration] with this documentation. We are going to have to let the cardholder win on this one as the argument against factoring is too great. Please review and advise.
> (Emphasis added.)

As noted above, the practice of credit card laundering is often referred to as "factoring."

119.   Peterson also directly instructed Abdelmesseh, acting in his capacity as EPS's sales agent, to spread out the transactions of KMA's client merchant across multiple merchant accounts opened in the names of the fictitious companies.

120.   In a September 17, 2012 email to "Mike Stewart" of KMA (Defendant Abdelmesseh), Peterson wrote:

> Stewart, Please see my notes below for the accounts that are on hold. We need to spread this out more, I am trying to cap each individual account in the $30-$40K range, so if you need to build a couple more accounts to reach your volume, please do so…" [Emphasis added]

121. The referenced merchant accounts ("the accounts that are on hold") included at least twelve of the 2012 MNF Fictitious Companies' merchant accounts that EPS had opened and used to process MNF transactions.

122. With respect to one of these merchant accounts, Peterson placed an explicit note: "On Hold – Pay out Tuesday – Do not put any more volume for the month through this one!"

123. Because Merrick's underwriting rules or monitoring practices were in part based on a merchant's projected or actual sales volume, a fraudulent merchant might obtain Merrick's approval or avoid Merrick's scrutiny if it appeared to process a lower volume of transactions.

124. By knowingly processing transactions for the same underlying merchant (that is, MNF) through multiple merchant accounts opened in the names of the fictitious companies, Peterson directly engaged in credit card laundering. He knowingly concealed the true identity of the merchant (MNF). Peterson also engaged in tactics to evade Merrick's underwriting rules or monitoring practices and the card networks' chargeback monitoring programs, by spreading out the MNF transactions across multiple merchant accounts in order to artificially lower the volume of sales and chargeback transactions processed through any single merchant account.

***By February 2013, EPS Knew That The 2012 MNF Fictitious Companies Had Changed Their Addresses to the Same Address, But Continued Using Wigdore and Abdelmesseh As EPS's Sales Agents***

125. In a February 21, 2013 email from KMA to an employee working in EPS's Risk Department, KMA provided EPS a list of address changes for numerous client

merchants. The list clearly revealed that almost all of the 2012 MNF Fictitious Companies, and numerous additional merchants, had changed their addresses to the same address (three post office boxes located at the same address in Phoenix, Arizona), an obvious sign that these entities were related to the same underlying merchant.

126.    An EPS Risk Department employee forwarded the list of address changes to Defendant Peterson and wrote a note asking: "Why are all the addresses the same?"

127.    Despite knowing that numerous allegedly different merchants (including the 2012 MNF Fictitious Companies) referred by KMA/Wigdore shared the same business address, in addition to all the other red flags regarding fraudulent activity by Wigdore and Abdelmesseh, EPS decided to renew its sales agent relationship with them.

### March 2013: EPS Entered Into a Three-Year Contract With Wigdore and Abdelmesseh

128.    In March 2013 EPS entered into a three-year "Marketing Agreement" with Defendant Electronic Payment Solutions of America, a company newly formed and jointly controlled by Wigdore and Abdelmesseh. EPS was so eager for business from Wigdore and Abdelmesseh that the contract included a provision requiring EPSA to submit all merchant applications to EPS on a "first right of refusal" basis, before referring merchants to other ISOs.

### Throughout 2013, EPS Continued Approving New Fraudulent Merchant Applications and Opening Merchant Accounts for New Fictitious Companies of the MNF Scam

129.    By the end of 2012, Merrick had declined the vast majority of the 2012 MNF Fictitious Companies. Despite this fact, throughout 2013, EPS continued accepting and approving merchant applications referred by Defendant Wigdore, using the "sales

channel 2088." These included phony merchant applications for the 2013 MNF Fictitious Companies.

130.    Like the merchant applications for the 2012 MNF Fictitious Companies, the applications for the 2013 MNF Fictitious Companies contained obvious signs that the merchants likely were not legitimate businesses and were related to the same underlying merchant. For example, at least 14 supposedly different merchants purported to have bank accounts at the same bank branch, this time at a Wells Fargo Bank branch located in Mesa, Arizona.

131.    The 2013 MNF Fictitious Companies included four fictitious entities controlled by Luke Rose, the principal of the MNF scam (S&P Marketing, CMH Marketing, CMT Marketing, GJ Financial). EPS processed at least $98,300 in transactions for these four fictitious companies combined.

132.    The 2013 MNF Fictitious Companies also included fictitious companies controlled by managers of the MNF scam. One MNF manager, Cordell Bess, created a new fictitious company (Premier Online Marketing Strategies) to replace his previous fictitious company (JJB Marketing). In 2012, EPS had processed for JJB Marketing, until Merrick instructed EPS to terminate the company. The EPS employee who reviewed the application for Bess's new company (Premier Online Marketing Strategies) specifically noted that EPS already had opened a "previous account" for the same underlying merchant. EPS nonetheless approved and processed $62,795 in transactions for this new fictitious company.

133.    A second MNF manager, Cynthia Miller, also known as "Cynthia Metcalf" and "Cynthia Wilson," controlled at least 13 of the 2013 MNF Fictitious Companies ("Cynthia Miller Fictitious Entities"), including: Jones Advertising Options; A&P Marketing Solutions; Phipps Marketing Advantages; Rogers Online Marketing; Prompt Preparation Services; Independent Home Solutions and Marketing; Elite LLC Preparation Services; Quintin Marketing Strategies; Priority Online Marketing Strategies; JSK Marketing; SNC Advertising; Luczko Marketing and Advertising. EPS processed a total of $1,666,003 in transactions through the 13 Cynthia Miller Fictitious Entities combined.

134.    Defendant Peterson was fully aware that the Cynthia Miller Fictitious Entities were in fact related to the same underlying merchant or individual. Indeed, in a spreadsheet attached to an email dated January 30, 2014 from Defendant Abdelmesseh ("Mike Stewart") to Mike Peterson, Abdelmesseh listed the names of the 13 merchants, the name of the straw "owner" of each merchant, and indicated that all 13 merchants in fact belonged to the same "Group" that was associated with one individual – "Cynthia Wilson."

135.    In 2013, EPS processed more than $1,827,098 of MNF transactions for the 2013 MNF Fictitious Companies combined.

### *July 2013: EPS Falsely Represented To Law Enforcement That It Was No Longer Doing Business With KMA*

136.    On July 18, 2013, the Oregon Department of Justice ("Oregon DOJ") contacted EPS, informing it of an investigation into an entity possibly related to KMA for violations of the Telemarketing Sales Rule and other laws. The Oregon DOJ investigator

asked EPS to clarify its relationship with KMA, and asked whether KMA was acting as a "satellite office" of EPS or as an EPS independent contractor.

137.   In response to the Oregon DOJ's inquiry, EPS's COO sent an email, dated July 18, 2013, in which he falsely represented that EPS was no longer doing business with KMA:  "As stated during our conversation yesterday, [EPS LLC] is a Colorado company.... Upon review of our information I see that we have done business in the past with a KMA Merchant Services LLC, an Arizona Corporate entity … although they are no longer active."

138.   Contrary to EPS' COO's representations, EPS continued working with KMA, EPSA, Wigdore and Abdelmesseh long after the COO's July 18, 2013 email. For example, in an August 21, 2013 email sent from Abdelmesseh ("Mike Stewart") to Defendant McCann, Abdelmesseh stated:

> We took this deal away from Powerpay. We sold it with no reserve. Please approve the deal for 75K to 100K monthly for each MID [referring to merchant accounts created, each with a "Merchant Identification" number] and we collectively will monitor the account. If a reserve is needed at a later time we can make that happen or shut off the account if it is not performing. We can get a lot of business from this customer via referral channel.

139.   EPS continued approving and processing for new merchants submitted by KMA and Wigdore, and continued processing for merchants previously referred to EPS by KMA, through at least the end of December 2013.

**EPS Knowingly Concealed the Identities of Additional Merchants**

140.    EPS's company practice of knowingly processing for merchants whose true identities were concealed was not limited to the MNF Fictitious Companies. The practice applied to other merchants as well.

141.    For example, in a September 17, 2013 email sent from EPS employee Chonda Pearson to an employee working in Wigdore's sales office, Pearson wrote: "Unfortunately this merchant has an open bankruptcy. We will be happy to process this deal with a new signer." Pearson's statement that the merchant circumvent Merrick's rules by simply finding a "new signer," is contrary to Merrick's underwriting policy that considered "any merchant that is currently in business bankruptcy" to be an "Unacceptable Merchant" for approval.

142.     Similarly, in a May 20, 2013 email exchange between EPS employee Pearson and another employee in Wigdore's sales office, regarding a merchant called "M2M Gold," Pearson wrote: "This is the same signer—we need a different signer on the application." Pearson again reiterated this point two hours later, in a follow-up email, stating: "I spoke to Mike Peterson … We cannot do anything with it until we have a different signer."

143.    Peterson and Abdelmesseh kept close track of the various merchants whose true identities were concealed behind different company names. For example, a spreadsheet attached to the January 30, 2014 email from "Mike Stewart" to Peterson listed numerous companies that belonged to particular "Groups." Each Group was

associated with a single individual. For example, six "merchants" were identified as belonging to the "Group" associated with "Ryan Helms." Five "merchants" were identified as belonging to the "Group" associated with "Andrew Chavez." Six "merchants" were identified as belonging to the "Group" associated with "Ovi."

144.    Of particular note, 17 "merchants" were identified as belonging to the "Group" associated with "Lance Himes." Lance Himes was a former associate of MNF who had participated in the MNF scam.

### EPS Was Aware of Complaints Regarding the KMA-Wigdore Defendants' Other Deceptive Marketing Practices

145.    EPS's employees were aware of complaints regarding various other deceptive marketing practices, not related to the MNF scam, engaged in by the KMA-Wigdore Defendants and the sales agents working in Wigdore's sales office. As early as December 19, 2011, one EPS employee emailed another EPS employee regarding a complaint received, stating: "New account we lost because Jay Wigdore lied."

146.    In a February 22, 2012 email exchange between EPS employees regarding the "Wigdore accounts," one EPS employee discussed two merchants: "Both of merchants have similar story, doing "lead generating" for Jay Wigdore . . . Dorothy Ventures isn't a business. Both ladies are retired, damn near 90. I talked to Jordan in Q&A and Travis about these accounts . . . both agreed the accounts were are most likely opened fraudulently by the agent(s)."

147.    In another email exchange between EPS employees, dated March 28, 2012, one employee described a consumer complaint received regarding false promises made

by the Wigdore sales agent: "They are promising trips/cruises/getaways etc to merchants for signing up with EPS." In reply, the other employee stated: "Yeah it's well-known at this point."

148.    In another email exchange between EPS employees regarding "Jay Wigdore Accounts," dated September 11, 2012, one employee wrote: "We've seen an increase of non-installed merchants who are being signed up under false pretenses (agent 2088)."

***EPS's Principals, Defendants Thomas McCann and John Dorsey, and EPS's Risk Manager, Defendant Peterson, Personally Approved and Monitored the MNF Merchant Accounts***

149.    EPS Defendants Peterson, McCann and Dorsey directly participated in EPS's central role in laundering transactions for the MNF scam.

150.    EPS required Peterson, EPS's Risk Manager, to closely track EPS's client merchants' sales and chargeback transaction activity on a regular basis. As noted above, various emails indicate that Peterson knew a great deal about the fraudulent nature of the businesses in which KMA and MNF were engaged, and their credit card laundering activities. Peterson received emails from Merrick in 2012, discussed above, in which Merrick expressed concern about KMA's high chargeback rate "and the reason codes for them (services not provided)" and in which Merrick expressed the opinion that KMA was engaged in the unlawful practice of "load balancing." In another email, Peterson expressed his conclusion that EPS should not fight a chargeback dispute involving a charge in the name of KMA Merchant Services for a "Rose Marketing" transaction, because "the argument against factoring is too great." In another email, Peterson directly

44

instructed Abdelmesseh, acting in his capacity as EPS's sales agent, to "spread out" KMA's client merchant's transactions across multiple merchant accounts opened in the names of several MNF Fictitious Companies. Peterson also kept close track of the various EPS client merchants whose identities were concealed behind different company names, and was fully aware that many of the MNF Fictitious Companies were related to the same underlying merchant or individual.

151.    Similarly, EPS's principals, Defendants McCann and Dorsey, approved and oversaw the MNF fraudulent merchant accounts, and personally met with the sales agents who referred the MNF Fictitious Companies to EPS.

152.    EPS did not have a separate department responsible for underwriting and approving merchant applications. Instead, EPS's principals, McCann and Dorsey, together with EPS's COO, were directly responsible for approving almost all merchant applications submitted to EPS for underwriting approval.

153.    Despite being EPS's Risk Manager, Defendant Peterson rarely had unilateral authority to approve any merchant applications. In fact, Peterson was generally required to obtain the approval of merchant applications from Defendants Dorsey or McCann, or EPS's COO.

154.    McCann and Dorsey personally met and communicated directly with the sales agents Wigdore and Abdelmesseh. They each approved numerous merchant applications for the MNF Fictitious Companies referred by Wigdore—applications that contained glaring signs indicating the high probability that the fictitious companies were not legitimate businesses and were related to each other or to the same underlying

merchant and, therefore, were likely being used to launder transactions for another merchant. As described above, in addition to numerous obvious signs that the purported merchants were not legitimate businesses, all the 2012 MNF Fictitious Company applications contained the facially suspect "Chase" checks—an obvious sign that the merchants likely were related to the same underlying merchant. Similarly, most of the 2013 MNF Fictitious Company applications stated that each of the merchants banked at the same Wells Fargo Bank branch.

155.    Dorsey personally approved numerous MNF Fictitious Company applications, including one merchant (Doc Assistant) whose application indicated that Wigdore was a co-owner or co-officer of the merchant, and that the merchant did not have a business website and owed a "past due amount" of $20,225. Dorsey approved another merchant (Green Merchant Marketing), even though the merchant did not have a business website and owed a "past due amount" of $139,463. Dorsey approved yet another merchant (V&R Marketing Solutions) who did not have a business website, owed a "past due amount" of $10,914, and whose credit report indicated that the merchant's address did not match the address listed on the application.

156.    On July 24, 2012, Dorsey approved a merchant (Elite Marketing Strategies), despite the fact that the merchant's incorporation papers indicated that the merchant had different owners and a different business address than those listed on the application. Moreover, an EPS employee had specifically noted that the merchant shared the same address as that of another EPS client merchant (JJB Marketing). EPS had previously processed for JJB Marketing just one month before, until it was instructed by

Merrick to terminate the merchant. Despite knowing that the new merchant was related to the previous client merchant, Dorsey approved the application.

157.    Similarly, McCann personally approved numerous MNF Fictitious Company applications, including eight applications submitted by Wigdore within a span of just two days (May 17, 2012 – May 18, 2012), two of which explicitly indicated that Wigdore was a co-owner or co-officer of the merchant (A&D Marketing, Miller Marketing Group), and five of which indicated that the merchant had the exact same "KMA" email address (A&D Marketing, Global One Media, DePaola Marketing, Wisdom Management Group, National Marketing Group). Two applications approved by McCann indicated that the merchants shared the same business address, a fact highlighted by the EPS employee who conducted the "initial risk evaluation" of the merchants.

158.    McCann and Dorsey closely monitored the referral of new merchants to EPS by EPS's sales agents, as evidenced in daily emails (titled "Daily Hot Sheets") sent by EPS employees to McCann and Dorsey throughout 2013. These Daily Hot Sheets provided McCann and Dorsey a daily log of all new merchants approved by EPS for processing, and identified the ISO sales agent who referred the merchant to EPS. The Daily Hot Sheets indicated that "Agent 2088" (KMA) was among EPS's top sales agents who were referring the highest number of merchant applications to EPS throughout 2013.

**Defendants Are Jointly and Severally Liable For the MNF
Transactions EPS Laundered Through Fraudulent Merchant Accounts**

159.    Both the KMA-Wigdore Defendants and the EPS Defendants are jointly and severally liable for the harm caused to consumers when they laundered MNF

transactions through the fictitious merchant accounts. Without the ISO and processing services provided by the Defendants, the MNF scam could not have obtained the fraudulent merchant accounts established at Merrick, which processed their credit card transactions.

160.    In 2012, EPS processed a total of more than $4,067,937 in sales transactions through the 2012 MNF Fictitious Company merchant accounts, the three KMA merchant accounts, and the Dynasty Marketing merchant account combined. In 2013, EPS processed more than $1,827,098 for the 2013 MNF Fictitious Companies combined.

161.    Many of the consumers whose credit cards were charged never obtained a refund or reversed charge for the unauthorized charges. Even those consumers who ultimately received a refund or reversed charge for the unauthorized charges were forced to expend valuable time and energy in requesting and seeking the refunds or chargebacks. In addition, these consumers' banks and the card networks also have incurred substantial economic harm as a result of expending time and energy processing requests for refunds or chargebacks.

162.    Consumers who directly suffered economic harm as a result of the Defendants' actions could not reasonably have avoided such harm because (a) they were deceived by the deceptive telemarketing practices of the MNF scam, (b) they never authorized the MNF scam or the EPS Defendants to charge their credit card accounts in the names of the MNF Fictitious Companies, and (c) they had neither knowledge of nor control over the Defendants' actions in creating the MNF Fictitious Companies'

merchant accounts through which Defendants processed MNF charges to the consumers' credit card accounts.

163.    Credit card laundering is illegal and prohibited by the rules and policies of the credit card networks. No countervailing benefits flow to consumers or the credit card industry marketplace from the Defendants' conduct because no legitimate business purpose exists for credit card laundering.

## VIOLATIONS OF THE FTC ACT

164.    Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce." Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

## COUNT I
### (Against KMA-Wigdore Defendants)

165.    As described in Paragraphs 55 through 163 of this Complaint, in numerous instances, in connection with providing ISO or payment processing services to merchants, Defendants Jay Wigdore; Michael Abdelmesseh; Nikolas Mihilli; Electronic Payment Solutions of America, Inc.; Electronic Payment Services, Inc.; KMA Merchant Services, LLC; and Dynasty Merchants, LLC have engaged in credit card laundering on behalf of the Money Now Funding scam by:

49

    a)  Falsely representing that the fictitious companies listed as the applicants on the merchant applications were the true merchants who were applying for merchant accounts; and/or

    b)  Falsely representing that the fictitious companies listed as the account holders of the merchants' bank accounts on the merchant applications were the true account holders of the merchants' bank accounts.

166.    The Defendants' actions caused or were likely to cause substantial injury to consumers that is not reasonably avoidable by consumers themselves and that is not outweighed by countervailing benefits to consumers or competition.

167.    Therefore, the Defendants' acts or practices, as described in Paragraphs 165 through 166 above, constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n).

## COUNT II
### (Against the EPS Defendants)

168.    As described in Paragraphs 55 through 163 of this Complaint, in numerous instances, in connection with providing ISO or payment processing services to merchants, Defendants Electronic Payment Systems, LLC; Electronic Payment Transfer, LLC; John Dorsey; Thomas McCann; and Michael Peterson have engaged in credit card laundering on behalf of the Money Now Funding scam by:

    a)  Falsely representing that the fictitious companies listed as the applicants on the merchant applications were the true merchants who were applying for merchant accounts;

b)  Approving and opening multiple merchant accounts in the names of numerous fictitious companies for the same underlying merchant, thereby concealing the true identity of the underlying merchant; and/or

c)  Processing transactions for the same underlying merchant through multiple merchant accounts opened in the names of numerous fictitious companies, thereby concealing the true identity of the underlying merchant whose transactions were processed.

169.   The Defendants' actions caused or were likely to cause substantial injury to consumers that is not reasonably avoidable by consumers themselves and that is not outweighed by countervailing benefits to consumers or competition.

170.   Therefore, the Defendants' acts or practices, as described in Paragraphs 168 through 169 above, constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. §§ 45(a) and (n).

## VIOLATIONS OF THE TSR

171.   Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original Telemarketing Sales Rule in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

172.   Pursuant to Section 3(c) of the Telemarketing Act, 15 U.S.C. § 6102(c) and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

173.    Under the TSR, a "merchant" means a person who is authorized under a written contract with an acquirer to honor or accept credit cards, or to transmit or process for payment credit card payments, for the purchase of goods or services or a charitable contribution. 16 C.F.R. § 310.2(u).

174.    Except as expressly permitted by the applicable credit card system, it is a deceptive telemarketing act or practice for:

a)  a merchant to present to or deposit into, or cause another to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant; or

b)  any person to employ, solicit, or otherwise cause a merchant, or an employee, representative or agent of the merchant, to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the merchant. 16 C.F.R. §§ 310.3(c)(1)–(2).

**CREDIT CARD LAUNDERING IN VIOLATION OF THE TSR**
**COUNT III**
**(Against All Defendants)**

175.    In numerous instances, and without the express permission of the applicable credit card system, the Defendants have employed, solicited or otherwise caused the MNF Fictitious Companies, or representatives or agents of the MNF Fictitious

Companies, to present to or deposit into, the credit card payment system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and the MNF Fictitious Companies, as described in Paragraphs 55 through 163 above.

176.   The Defendants' acts or practices, as described in Paragraph 175 above, are deceptive telemarketing acts or practices, that violate the TSR, 16 C.F.R. § 310.3(c)(2).

## COUNT IV
### (Against KMA Merchant Services and Michael Abdelmesseh)

177.   In numerous instances, and without the express permission of the applicable credit card system, Defendants KMA Merchant Services, LLC and Michael Abdelmesseh have presented to or deposited into, or caused another to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing transaction that is not the result of a telemarketing credit card transaction between the cardholder and KMA Merchant Services, LLC.

178.   KMA Merchant Services, LLC's and Michael Abdelmesseh's acts or practices, as described in Paragraph 177 above, are deceptive telemarketing acts or practices, that violate the TSR, 16 C.F.R. § 310.3(c)(1).

## COUNT V
### (Against Dynasty Merchants, LLC and Nikolas Mihilli)

179.   In numerous instances, and without the express permission of the applicable credit card system, Defendants Dynasty Merchants, LLC and Nikolas Mihilli have presented to or deposited into, or caused another to present to or deposit into the credit card system for payment, a credit card sales draft generated by a telemarketing

transaction that is not the result of a telemarketing credit card transaction between the cardholder and Dynasty Merchants, LLC or Mihilli.

180.   Dynasty Merchants, LLC's and Mihilli's acts or practices, as described in Paragraph 179 above, are deceptive telemarketing acts or practices, that violate the TSR, 16 C.F.R. § 310.3(c)(1).

## CONSUMER INJURY

181.   As described in paragraph 160 above, consumers throughout the United States have suffered and will continue to suffer substantial injury as a result of the Defendants' violations of the FTC Act and the TSR. In addition, Defendants have been unjustly enriched as a result of their unlawful acts and practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THE COURT'S POWER TO GRANT RELIEF

182.   Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies, to prevent and remedy any violation of any provision of law enforced by the FTC.

183.   Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers

54

resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts, and the refund of money.

## PRAYER FOR RELIEF

184.   Wherefore, Plaintiff FTC, pursuant to Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), and the Court's own equitable powers, requests that the Court:

a)   Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief;

b)   Enter a permanent injunction to prevent future violations of the FTC Act and the TSR by Defendants;

c)   Award such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the FTC Act and the TSR, including, but not limited to, rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies; and

d)   Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

DATED this _____ day of July, 2017.

/s/ Michelle Chua_____
Michelle Chua