**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Federal Trade Commission,

Plaintiff,

v.

Electronic Payment Solutions of America Incorporated, et al.,

Defendants.

No. CV-17-02535-PHX-SMM

**ORDER**

Pending before the Court is Defendants Electronic Payment Systems, LLC and Electronic Payment Transfer, LLC's (collectively, "EPS") Motion for Summary Judgment. (Doc. 268.) The motion is fully briefed and ripe for review. (Id.; Docs. 274; 283; 297; 298.)

## I. BACKGROUND[1]

In 2013, Plaintiff Federal Trade Commission ("FTC") brought suit against Money Now Funding ("MNF"), a telemarketing scheme that sold worthless business opportunities to consumers as a cover to launder money via fraudulent credit card transactions. (Docs. 270 at 1-2; 275 at 4-5.) Credit card processing involves numerous entities including, on one side, the consumer and the consumer's bank, and on the other, the merchant and the merchant's bank. (Doc. 85 at 4-5.) In between the consumer and the merchant are the credit card networks and other third parties such as independent sales organizations ("ISOs"). (Id. at 5.) ISOs solicit merchants seeking to open merchant accounts and refer them to the ISOs'

[1] Due to the fact that the parties cited a limited number of facts in support of their respective briefs, the Court considered additional materials in the record to review the pending motion. See Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.").

acquiring bank, which is the bank that has access to the credit card networks. (Id.) Merchant accounts are established to settle payment of credit card transactions. (Id.) The practice of processing credit card transactions through another company's merchant account is called "credit card laundering" and is illegal under the Telemarketing Sales Rules ("TSR"), 16 C.F.R. Part 310. (Id. at 4.)

To facilitate the MNF scheme, the MNF principals created fictitious entities and processed individual's credit card charges through merchant accounts associated with the fictitious entities, rather than through a merchant account associated with MNF. (Docs. 270 at 2; 275 at 4-5.) The MNF scheme resulted in a total consumer injury of over $7,000,000.00. (Doc. 274 at 7.) The FTC settled with many of the MNF defendants in 2015, and, in 2016, the Arizona Attorney General's Office brought criminal charges against four of the MNF principals. (Doc. 85 at 13.) As of January 2017, all four defendants pled guilty. (Id.)

During the investigation and prosecution of the MNF principals, the FTC discovered that the defendants[2] named in the instant matter (collectively, "Defendants") played an integral role in facilitating the MNF scheme. (Doc. 184 at 8.) The FTC brought this action against Defendants as an outgrowth of the MNF action. (Id.)

In the instant action, EPS served as the ISO to numerous entities involved in the MNF scheme and set up and approved the merchant accounts for the fictitious entities. (Docs. 85 at 10; 270 at 2; 275 at 5.) Defendant John Dorsey ("Dorsey") is the CEO and co-owner of EPS, and Defendant Thomas McCann ("McCann") is the managing member and co-owner of EPS. (Doc. 85 at 10-11.) Dorsey and McCann were responsible for approving all merchant applications submitted to EPS. (Id. at 44-47.) Defendant Michael Peterson ("Peterson") is the former risk manager of EPS. (Id. at 11.)

EPS used Defendant Jay Wigdore, Defendant Michael Abdelmesseh, Defendant

[2] The FTC brought suit against Electronic Payment Solutions of America, Inc., Electronic Payment Services, Inc., KMA Merchant Services, LLC, Dynasty Merchants, LLC, Jay Wigdore, Michael Abdelmesseh, Nikolas Mihilli, Electronic Payment Systems, LLC, Electronic Payment Transfer, LLC, John Dorsey, Thomas McCann, and Michael Peterson. (Doc. 1 at 1.)

Nikolas Mihilli, and companies associated with these defendants (collectively, the "KMA-Wigdore Defendants") to market its services. (Id. at 6-7, 9.) According to the First Amended Complaint ("FAC"), EPS processed consumer transactions through the fictious entities' merchant accounts and then transferred the money to the companies associated with the KMA-Wigdore Defendants. (Id. at 6.)

Based on the foregoing, the FTC brought this action on July 28, 2017 against Defendants under § 13(b) of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 53(b), and the Telemarketing and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. §§ 6101-6108. (Id. at 3.) The FTC seeks to recover $4,677,935.75, representing $6,282,519.40 in total credit card transactions that were run through the subject merchant accounts minus $1,604,583.65 of credit card charge backs. (Docs. 270 at 3; 275 at 6.)

EPS now moves for summary judgment on two legal issues: (1) whether the FTC's monetary claim against EPS should be limited to EPS's net profits; and (2) whether the consumers' injuries under the MNF scheme were reasonably avoidable. (Docs. 268 at 2; 269 at 2, 12.)

## II. LEGAL STANDARD

"A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought." Fed. R. Civ. P. 56(a). A court must grant summary judgment if the pleadings and supporting documents, viewed in the light most favorable to the nonmoving party, show "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Id.; see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Jesinger v. Nev. Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir. 1994). Substantive law determines which facts are material. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); see also Jesinger, 24 F.3d at 1130. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. The dispute must also be genuine, that is, the evidence must be "such that a

reasonable jury could return a verdict for the nonmoving party." Id.; see Jesinger, 24 F.3d at 1130.

A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." Celotex, 477 U.S. at 323-24. Summary judgment is appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322; see also Citadel Holding Corp. v. Roven, 26 F.3d 960, 964 (9th Cir. 1994). The moving party need not disprove matters on which the opponent has the burden of proof at trial; instead, the moving party may identify the absence of evidence in support of the opposing party's claims. See Celotex, 477 U.S. at 317, 323-24. The party opposing summary judgment need not produce evidence "in a form that would be admissible at trial in order to avoid summary judgment." Id. at 324. However, the opposing party "may not rest upon the mere allegations or denials of [the party's] pleadings, but … must set forth specific facts showing that there is a genuine issue for trial." See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)).

## III. DISCUSSION

Although EPS captioned its motion as a motion for summary judgment, its motion is, in fact, a partial motion for summary judgment as EPS moves for summary judgment on two discrete legal issues. First, EPS moves the Court to limit the FTC's monetary claim against EPS to EPS's alleged net profits of $63,000.00. (Doc. 269 at 2, 3.) Second, EPS moves the Court to grant summary judgment in EPS's favor on the FTC's claim under 15 U.S.C. § 45(n) of the FTC Act, arguing that any harm suffered by consumers was reasonably avoidable. (Id. at 12.) The Court addresses each argument in turn.

### A. Whether the Monetary Relief Should be Limited to EPS's Net Profits

In its motion, EPS first argues that § 13(b) authorizes only injunctions and not an award of monetary relief, recycling a previous argument from its motion to dismiss (see Doc. 153-1 at 3). (Docs. 269 at 3-7; 297 at 2 n.1.) However, the Court already found in its

August 28, 2019 Order, which ruled on EPS's motion to dismiss, that both restitution and disgorgement are permissible forms of equitable relief under § 13(b). (See Doc. 212 at 5-6.) Accordingly, the Court will not revisit the issue at this time as the Court remains bound by still-standing Ninth Circuit precedent. (See id.) See F.T.C. v. AMG Cap. Mgmt., LLC, 910 F.3d 417, 427 (9th Cir. 2018)[3]; F.T.C. v. Commerce Planet, 815 F.3d 593, 598-99 (9th Cir. 2016); F.T.C. v. Neovi, Inc., 604 F.3d 1150, 1159-60 (9th Cir. 2010); F.T.C. v. Pantron I Corp., 33 F.3d 1088, 1102 (9th Cir. 1994).

EPS next contends that the FTC's monetary claim for relief against EPS must be limited to EPS's net profits. (Doc. 269 at 2.) Specifically, EPS argues that, while the FTC labels the monetary relief it seeks as "consumer redress, equitable monetary relief, unjust enrichment, a refund of monies paid, restitution, and sometimes, disgorgement," the relief the FTC seeks is actually a claim for disgorgement. (Id. (citations omitted).) Because the FTC seeks only disgorgement, EPS contends that the FTC must limit its claim for disgorgement to EPS's net profits. (Id. at 2-9.) In support, EPS cites to Liu v. S.E.C., 140 S. Ct. 1936 (2020) for the proposition that a disgorgement award is an equitable form of relief so long as it is limited to an individual defendant's net profits and awarded to victims. (Doc. 297 at 3 (citing Liu, 140 S. Ct. at 1940).) The FTC disagrees. (See generally Doc. 274.) The FTC first contends that disgorgement is not the sole remedy that the FTC seeks; second, a disgorgement award need not be limited to an individual defendant's net profits; and third, Liu is inapplicable as the opinion was limited to the issue of "whether, and to what extent, the [Securities and Exchange Commission ('SEC')] may seek 'disgorgement' in the first instance through its power to award 'equitable relief' under 15 U.S.C. § 78u(d)(5)." (Id. at 11-15; Doc. 298 at 2 (citing Liu, 140 S. Ct. at 1940).)

Here, the Court first finds that the FTC seeks multiple forms of equitable monetary relief in its FAC including restitution and disgorgement. In the eyes of the law, restitution

[3] The Court is aware that the Supreme Court granted certiorari in AMG Capital Management to determine whether the FTC may seek restitution and disgorgement in addition to an injunction in actions brought under § 13(b) of the FTC Act. AMG Cap. Mgmt, LLC v. F.T.C., 910 F.3d 417 (9th Cir. 2018), cert. granted, 2020 WL 3865250 (U.S. July 9, 2020) (No. 19-508). However, until such time that the Supreme Court issues its opinion in that matter, AMG Capital Management and Commerce Planet remain good law.

and disgorgement are distinguishable. See Liu, 140 S. Ct. at 1942-43; Kokesh v. S.E.C., 137 S. Ct. 1635, 1640 (2017); Commerce Planet, 815 F.3d at 600-01. Restitution and disgorgement "are different remedies, governed by different standards, that are intended to achieve different objectives." F.T.C. v. Noland, No. CV-20-00047-PHX-DWL, 2020 WL 4530459, at *5 (D. Ariz. Aug. 6, 2020) (citing Osborn v. Griffin, 865 F.3d 417, 461 (6th Cir. 2017) ("As used in modern parlance, disgorgement and restitution are distinct remedies that serve different purposes."); S.E.C. v. Huffman, 996 F.2d 800, 802 (5th Cir. 1993) ("Despite some casual references in our caselaw to the contrary, disgorgement is not precisely restitution. Disgorgement wrests ill-gotten gains from the hands of a wrongdoer … [and] does not aim to compensate the victims of the wrongful acts, as restitution does. Thus, a disgorgement order might be for an amount more or less than that required to make the victims whole. It is not restitution.")).

When a court orders restitution, the court orders the return to a victim of any monies that the victim is legally entitled. See Commerce Planet, 815 F.3d at 600; see also Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. a (2011) [hereinafter Restatement (Third)]. Whereas, when a court authorizes disgorgement, "the court is not awarding damages to which [a] plaintiff is legally entitled but is exercising the chancellor's discretion to prevent unjust enrichment." S.E.C. v. Rind, 991 F.2d 1486, 1493 (9th Cir. 1993) (citing S.E.C. v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 95 (2d Cir. 1978)); see Kokesh, 137 S. Ct. at 1640; Huffman, 996 F.2d at 802; Restatement (Third) § 51 cmt. a, e. Thus, "it remains with the court's discretion to determine how and to whom the money will be distributed" when authorizing a disgorgement award. S.E.C. v. First Pac. Bancorp, 142 F.3d 1186, 1191 (9th Cir. 1998).

While restitution and disgorgement are legally distinguishable, the Court finds that restitution and disgorgement operate in the same manner in a court of equity. The Supreme Court's holding in Liu supports this conclusion. The question presented before the Supreme Court in Liu was whether § 78u(d)(5) – a provision of the SEC statute – authorizes the SEC to seek disgorgement beyond a defendant's net profits from wrongdoing. 140 S. Ct. at

1942. To address the question presented, the Supreme Court reviewed equity jurisprudence generally and relied on cases such as Great-West Life & Annuity Insurance Company v. Janette Knudson, 534 U.S. 204 (2002), Tull v. United States, 481 U.S. 412 (1987), and Porter v. Warner Holding Co., 328 U.S. 395 (1946). Id. at 1942-43. The Supreme Court also discussed the similarities between profit-based measures of unjust enrichment such as restitution and disgorgement. Id. The Supreme Court found that "equity practice long authorized courts to strip wrongdoers of their ill-gotten gains"; however, "to avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits to be awarded for victims." Id. at 1942. Accordingly, the Supreme Court held that "a disgorgement award that *does not exceed a wrongdoer's net profits* and *is awarded for victims* is equitable relief permissible under § 78u(d)(5)." Id. at 1940 (emphasis added).

Thus, pursuant to Liu, a disgorgement order must be crafted so that its effect is "restitutionary." S.E.C. v. Yang, No. 19-55289, 2020 WL 4530630, at *2 (9th Cir. Aug. 6, 2020) (mem.). That is, to be an equitable form of relief, a disgorgement award must be awarded to victims. Accordingly, in a court of equity, the Court finds that restitution and disgorgement operate in the same manner as both restitution and disgorgement must be awarded to victims to constitute an equitable form of relief. See id.; see also Liu, 140 S. Ct. at 1940.

The Court further finds that disgorgement must be limited to an individual defendant's net profits to be an equitable form of relief pursuant to Liu. The question presented in Liu was specific to a SEC enforcement proceeding, and, as another court in this district noted, did not address the FTC or the FTC Act, which is an entirely different statute than § 78u(d)(5). See Noland, 2020 WL 4530459, at *4 (noting the "textual differences between the two statutes"). Nevertheless, Liu reached its conclusion by relying on equity jurisprudence *generally*, as opposed to relying on SEC jurisprudence *specifically*. Thus, Liu's holding – that a disgorgement award must be limited to a defendant's net profits – is not "cabined" to SEC proceedings. Contra F.T.C. v. Cardiff, No. ED CV 18-2104-

DMG (PLAx), 2020 WL 3867293 at *5 (C.D. Cal. July 7, 2020) ("Liu's holding is cabined to disgorgement in SEC actions under a distinct provision of the SEC Act – which the Court previously held constitutes penalties, not equitable relief."). Rather, Liu's holding is equally applicable to the case at hand.

With that said, it must be acknowledged that two district courts in this circuit have reached the opposite conclusion, finding that Liu is inapplicable to a FTC proceeding. See Noland, 2020 WL 4530459, at *4-5; Cardiff, 2020 WL 3867293 at *5-6. The Noland and Cardiff courts focused on the fact that the question presented in Liu was specific to a SEC enforcement proceeding. See Noland, 2020 WL 4530459, at *4-5; Cardiff, 2020 WL 3867293 at *5-6. However, the Court does not believe that Liu's holding is so limited. As the Court mentioned above, although the question presented in Liu was specific to a SEC statute, the Supreme Court did not rely on SEC case law or statutes to reach its conclusion. Instead, the Supreme Court relied on equity jurisprudence generally. Accordingly, the Court finds that Liu is applicable in a FTC proceeding, and thus, to the extent the FTC is entitled to a disgorgement award, a disgorgement award must be limited to EPS's net profits and awarded to victims.[4]

EPS last argues that it cannot be held jointly and severally liable for the total consumer losses; it can be held liable only for its own net profits because the FTC did not allege that Defendants were "partners engaged in concerted wrongdoing," a showing EPS contends is now necessary to establish joint and several liability. (Docs. 269 at 9; 297 at 2, 5 (citing Liu, 140 S. Ct. at 1949).) However, the FTC argues that all defendants involved in consumer losses are held jointly and severally liable in the Ninth Circuit. (Doc. 298 at 4 (citing Commerce Planet, 815 F.3d at 598-601).) The FTC further argues that Liu did not foreclose the FTC's ability to seek joint and several liability as it did not address whether joint and several liability was a permissible form of equitable relief. (Id. at 5.)

"Equity courts have long exercised the power to impose joint and several liability."

---

[4] While EPS alleges that its net profits were $63,000.00, this material fact is disputed so the Court refrains from ruling on the amount of EPS's net profits at this time. (Compare Doc. 270 at 3, with Doc. 275 at 8.)

Commerce Planet, 815 F.3d at 600. In the Ninth Circuit, all defendants may be held jointly and severally liable for consumer losses. See id. As a result, a restitution or disgorgement award "need not be limited to the funds each defendant personally received from the wrongful conduct." Id. at 601. "Defendants held jointly and severally liable for payment of restitution are liable for the unjust gains the defendants *collectively* received, even if that amount exceeds (as it usually will) what any one defendant pocketed from the unlawful scheme." Id. (emphasis in original).

Here, while the Ninth Circuit has broadly held all defendants jointly and severally liable for consumer losses, the Court finds that Liu restricts who may be held jointly and severally liable. In Liu, the defendant argued that the disgorgement award "crosse[d] the bounds of traditional equity practice" because it was imposed with joint and several liability. 140 S. Ct. at 1947. The Supreme Court declined to answer defendant's argument as the parties did not fully brief the issue, but the Supreme Court articulated principles for courts to employ to determine whether joint and several liability was a permissible form of equitable relief. Id. In doing so, the Supreme Court relied on Ambler v. Whipple, 87 U.S. 546, 559 (1874) in stating that joint and several liability was a permissible form of equitable relief at common law for "partners engaged in concerted wrongdoing." Id. at 1945, 1949. The Supreme Court left it for the Ninth Circuit to determine on remand "whether the facts are such that petitioners can consistent with equitable principles, be found liable for profits as partners in wrongdoing or whether individual liability is required." Id. at 1949.

Similar to the Court's finding above, because the joint and several liability principles articulated in Liu were not specific to SEC enforcement proceedings but were based on common law joint and several liability principles generally, Liu is equally applicable here. Thus, EPS may be held jointly and severally liable for the total consumer losses if the FTC proves that EPS was partners engaged in concerted wrongdoing with Defendants; an issue not before the Court at this time as the parties did not brief the issue. In essence, partnership is a matter of factual proof that cannot be dispositively resolved here. Therefore, the Court will deny EPS's motion on this ground.

**B. Whether the Consumers' Injuries were Reasonably Avoidable**

EPS next moves for summary judgment on the FTC's claim under 15 U.S.C. § 45(n), arguing that summary judgment is warranted because any harm that consumers suffered under the MNF Scheme was reasonably avoidable. (Doc. 269 at 12.)

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). An act or practice is unfair if "the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). "In determining whether consumers' injuries were reasonably avoidable, courts look to whether the consumers had a free and informed choice." Neovi, 604 F.3d at 1158. An injury is reasonably avoidable if consumers "have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." Davis v. HSBC Bank Nev., N.A., 691 F.3d 1152, 1169 (9th Cir. 2012) (citation omitted).

EPS argues that consumers could have reasonably avoided injury by utilizing the charge back system provided by the credit card networks. (Doc. 269 at 12.) A charge back is a credit card charge reversal that returns money to a consumer. (Docs. 270 at 4; 274 at 17; 275 at 8-9.) A consumer may raise a charge back request prior to paying the consumer's credit card bill for those charges that the consumer believes are improper. (Docs. 269 at 14; 270 at 4; 275 at 9.) When a charge back request is raised, the issuing bank automatically credits the consumer's credit card account; thus, the consumer is kept whole while the validity of the charge back is determined. (Docs. 269 at 14; 270 at 4; 275 at 9.) Accordingly, EPS contends that any consumer injury was reasonably avoidable because a consumer can stop a transaction prior to parting with the consumer's money and there is no amount of time in which funds are unavailable to a consumer. (Doc. 269 at 13.)

In opposition, the FTC contends that any consumer injury was not reasonably avoidable via the charge back system, especially in light of Defendants', including EPS's,

interference in the normal operation of that system. (Doc. 274 at 17.) For example, the FTC states that Defendants obtained consumers' signatures on a document entitled Certificate of Satisfactory Completion and Authorization (the "Certificate"), in which consumers attested to their satisfaction with the MNF program prior to actually joining the program, and that Defendants used the Certificate to challenge consumer charge back requests. (Id.; Doc. 275 at 14.) The Certificate was created by EPS risk department employee Travis Bellet. (Docs. 274 at 18-19; 275 at 14.) In addition, the FTC argues that Defendants further interfered in the operation of the charge back system by creating the Customer Retention Center Services, an entity designed to challenge consumer charge back requests. (Docs. 274 at 18; 275 at 14.) Further, the FTC contends that EPS Risk Manager Peterson instructed the KMA-Wigdore Defendants on how to win charge back requests, even traveling to Arizona to offer such instruction. (Docs. 274 at 18; 275 at 14.) Last, the FTC states that Defendants "strung people along" until the time for requesting a charge back had expired. (Docs. 274 at 19; 275 at 14.) Because Defendants interfered with the normal operation of the charge back system, the FTC contends that any consumer injury was not reasonably avoidable via that system. (Doc. 274 at 18.)

Aside from Defendants' interference with the charge back system, the FTC also argues that consumers could not reasonably avoid injuries via the charge back system because some consumers are unaware of their right to dispute a credit card charge; some consumers may give up on a charge back request after a merchant refuses to grant a refund; and some consumers, who requested charge backs in the instant matter, either did not receive or received only part of their money back. (Id.; Docs. 275 at 13, 15; 275-3 at 330.) Thus, the FTC contends that any consumer injury was not reasonably avoidable. (Doc. 274 at 17-18.)

Here, the Court finds that any harm suffered by consumers was not reasonably avoidable via the charge back system. Although EPS contends that a consumer could reasonably avoid loss under the charge back system because consumers can initiate a charge back before consumers have to pay their bills and "there is no period of time when

the funds are unavailable to the consumer," Defendants' contention is flawed considering the MNF scheme resulted in a total injury to consumers of over $7,000,000.00. In addition, it is unreasonable for EPS to argue that consumers could reasonably avoid loss via the charge back system when Defendants constructed mechanisms to frustrate the very system that they argue consumers could utilize to avoid the loss. Further, the charge back system was not a reasonable mechanism by which consumers could avoid loss as it is likely that some consumers never noticed fraud on their credit card statements, and thus, were unable to utilize the charge back system to avoid the loss. Even if a consumer did notice the fraud, a consumer suffers unavoidable injuries regardless of whether a credit card transaction is reversed as "obtaining reimbursement require[s] a substantial investment of time, trouble, aggravation, and money." Neovi, 604 F.3d at 1158. Accordingly, the Court finds that any consumer injury was not reasonably avoidable via the charge back system and denies EPS's motion on this ground.

**IV. CONCLUSION**

Based on the foregoing,

**IT IS HEREBY ORDERED denying** Defendant EPS's Motion for Summary Judgment. (Doc. 268.)

Dated this 31st day of August, 2020.

Honorable Stephen M. McNamee
Senior United States District Judge